STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.  0-12-cv-62080-RSR

SIG, INC., D/B/A VISONIC
SYSTEMS, a Florida corporation,
and SECURE2WARE, INC., a Florida
corporation, on behalf of themselves and all
others similarly situated,

        Plaintiffs,                                **Class Action**

vs.

AT&T DIGITAL LIFE, INC., a New York
corporation, f/k/a XANBOO, INC., and AT&T
TELEHOLDINGS, INC., a Delaware corporation,

        Defendants.
_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs SIG, Inc., d/b/a ViSonic Systems ("ViSonic"), and Secure2Ware, Inc. ("Secure2Ware") (collectively, "Plaintiffs"), by their undersigned counsel, file their Amended Class Action Complaint (the "Complaint") against the Defendants AT&T Digital Life, Inc. f/k/a Xanboo, Inc. ("Xanboo"), and  AT&T Teleholdings, Inc. ("AT&T Teleholdings") (Xanboo and AT&T Teleholdings are collectively sometimes  "AT&T" or "Defendants"), and state as follows:

### INTRODUCTION

1.      Promising "best in breed" new products, services and support, and continuing market penetration, Xanboo brand building and brand awareness, the Defendants induced the Plaintiffs to become Xanboo dealers.  The Plaintiffs invested thousands of dollars each in equipment, supplies and marketing, and thousands more in time and effort, to acquire, sell and distribute the Xanboo home security system and other Xanboo products and services.

2.      After extracting the Plaintiffs' money, Defendants with no warning, pulled the plug on the business, leaving the Plaintiffs' dealers high and dry with useless equipment, unsold and unsellable inventory, and no recourse but legal action.

### PARTIES

3.      ViSonic is a Florida corporation with a principal place of business at 4915 NE 12th Avenue, Oakland Park, FL 33334. ViSonic provides integration, design and research and markets, distributes, supplies and installs home and business electronic systems, including home security and home broadband services and products.  Raymond Lovell ("Lovell") is ViSonic's owner and principal.

4.      Secure2Ware is a Florida corporation with a principal place of business on 1589 West Brandon Boulevard, Tampa, Florida 33511.  Secure2Ware provides, among other things, alarm systems for commercial and residential buildings, video cameras, alarm monitoring and related goods and services.  Keith Ware is Secure2Ware's owner and principal.

5.      Defendant AT&T Digital Life, Inc. (formerly Xanboo, Inc.) is a New York corporation with its principal place of business at 1025 Lenox Park Blvd., Suite D593, Atlanta, Georgia, and with Kevin Peterson as its Chief Executive Officer, according to the records of the New York State Department of State, Division of Corporations.On March 1, 2012, Xanboo, Inc. changed its name to AT&T Digital Life, Inc.

6.      Defendant AT&T Teleholdings, Inc. is a Delaware corporation with its principal place of business located at 305 Wacker Drive, Chicago, Illinois and according to its annual report provides various communications services, including local and long-distance telephone, cellular, paging, security, cable TV, Internet access, and directory publishing services to approximately 12 million customers in Illinois, Indiana, Michigan, Ohio, and Wisconsin, as of

June 30, 1999. As of that date, the company had cellular interests in Norway, as well as interests

in communications companies in Belgium, Denmark, and Hungary.  It also published business

directories in Germany and other European countries. AT&T Teleholdings, Inc. operates as a

subsidiary of AT&T, Inc.

7.     On or about November 2, 2010, AT&T Teleholdings executed an agreement, with

an effective date of on or about December 3, 2010, under which AT&T Teleholdings bought all

of Xanboo's stock under an "Agreement and Plan of Exchange" and by which Xanboo was to

become a "wholly owned subsidiary."

8.     Businessweek's web-based "Private Company Information" describes Xanboo

thusly:

> Xanboo, Inc. provides a technology platform that enables access and control of
> devices through TV, PC, Internet, and mobile.  Its platform helps users in video
> monitoring, device control, notification, and data transmission with internet
> access.  The company also offers various hardware and software, including video
> cameras, sensors, control devices, and accessories.   Its solutions are used in
> residential, business, security, energy management, healthcare, and remote video
> monitoring applications.  Xanboo, Inc. was founded in 1999 and is headquartered
> in New York, New York.

9.     Xanboo claimed to offer, "for about the cost of a hot tub," a way for a homeowner

to:

> [m]anage your alarm system, control your lights, adjust your thermostats and
> schedule your appliances from anywhere in the world.  Watch your kids come
> home from school on any Smart Phone or office computer.  Review your energy
> usage from as far back as a year and watch your system pay for itself.

## JURISDICTION AND VENUE

10.     This Court has original subject matter jurisdiction under the Class Action Fairness

Act, 28 U.S.C. §§ 1332(d) because (i) the number of Class Members is 100 or more; (ii) the

Class Members' damages, the aggregate amount in controversy exclusive of interest and costs,

exceeds $5,000,000; and (iii) minimal diversity exists because at least one of the Class Plaintiffs and one Defendant are citizens of different states.

11.     This Court has supplemental and pendent jurisdiction over the Class Plaintiffs' state law claims under 28 U.S.C. § 1367.

12.     Jurisdiction is also proper in this Court because of Defendants' many, systematic and material contacts with the State of Florida.  Defendants marketed and sold their products and services to ViSonic and other dealers in Florida.  AT&T Teleholdings unilaterally stopped providing those products and services to ViSonic and other dealers in Florida, with the foreseeable consequence that the results of that stoppage would be felt in Florida by Florida dealers and their own customers.   Defendants' Terry Gurley and Scott Gurley repeatedly communicated with ViSonic in Florida.  ViSonic communicated in Florida on a few occasions with Defendants' Tom Christ, who was based in Fort Lauderdale, Florida, and was charged with providing dealer support.   ViSonic received in Florida certain marketing materials, for example, two tri-fold brochures, from Xanboo's marketing department, headed by Arin LoPrete.  Xanboo arranged for a company called Globally Boundless to use images from dealers for inclusion on Xanboo-developed templates for marketing materials for use in Florida, as well as other states. This Court's exercise of jurisdiction over Defendants offends neither notions of fair play and substantial justice, nor any other due process principles.   Xanboo and AT&T Teleholdings reasonably could expect to be summoned before the courts of the State of Florida.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1). For purposes of venue under 28 U.S.C. § 1391(b), Xanboo and AT&T Teleholdings, both corporations, are deemed to reside in any judicial district, including this one, in which they are subject to personal jurisdiction at the time this action is commenced, under  28 U.S.C. § 1391(c).  Xanboo and

AT&T Teleholdings are subject to personal jurisdiction in this judicial district because they regularly do business in and generate substantial revenues and profits in Florida from Florida residents.

14.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(c), because a substantial part of the events or omissions giving rise to the Class Plaintiffs' claims took place in this judicial district.

## FACTS

### Xanboo's Business

15.     Xanboo's website answers the question "What is Xanboo?" by describing "The Xanboo Platform:"

> Xanboo provides an end-to-end technology platform that enables access and control of devices locally via a TV or PC, and remotely over the Internet via a mobile phone or PC.
>
> Using Xanboo patented technology to connect from remote locations to a gateway in the home, users control and monitor devices from anywhere in   the world via a standard web interface.
>
> Xanboo's technology is market agnostic and provides a platform to a wide range of partners wishing to deliver services based upon video monitoring, device control, notification or data transmission, to any location with internet access.
>
> Using the Xanboo Software Development Kit (the SDK), partners can provide a wide range of previously unavailable revenue generating   services   to   their customers under their own brand.  These services, customized to each partner's particular requirements, are being used in    markets ranging from security and energy management to home healthcare.

16.     A December 6, 2010 article by Julie Jacobson described Xanboo as "one of the original platform developers for remote home management."  *See* http://www.electronichouse. com/article/att_joins_home_automation_fray_acquires_xanboo/.

17.     The Jacobson article goes on to describe Xanboo:

Xanboo technology enables users to remotely monitor and manage their home's security, lighting, thermostats and other devices via the Internet, cellphone and other communications devices.  Like iControl, uControl and 4Home, Xanboo has developed its own products in the past, but always intended to market its platform to third-party service providers.

18.     Xanboo's website describes, and touts its products as "best in breed" based on five claimed advantages: "1. Stability, Reliability, Repeatability;" "2. No-Touch Installation;" "3. Operates with Many Panels and Devices;" "4. Patented Technology;" and "5. Customized User Interface with Your Own Name and Brand."

19.     Xanboo's website describes offerings in the following segments: "Security Enhanced Upgrade;" "Residential;" "Xanboo: Energy Enhanced;" and "Remote Video Monitoring."

20.     Xanboo's "Security Enhanced Upgrade," among other claimed virtues, states that users can "manage your security system from your computer or mobile phone."  Xanboo promised that customers could "access your cameras from anywhere" and could "[c]heck-in to see what's happening at home or your business from anywhere, anytime.  **With Xanboo Security Enhanced, you can connect up to 10 cameras that can be remotely accessed from anywhere.**"  (Emphasis in original.)

21.     Xanboo touted to the Plaintiffs the Xanboo offering permitting customers to "[a]ccess any CCTV cameras in your home or business remotely to see what triggered the alarm via live, real-time video.  Additionally, you can view video clips from these cameras which store recorded video **starting 5 seconds before** the alarm was triggered." (Emphasis in original.)

22.     Xanboo's "Residential" program claims, among other things, to "turn your mobile phone into a window to your home."

23.     Xanboo's "Energy Enhanced" program among other touted advantages, claims to provide "Smart Energy Management & Control for Your Green Home or Business."  In fact,

however, these Xanboo claims were for what amounted to "vaporware" – the claims exceeded the technology's capability.

24.     Xanboo's "Remote Video Monitoring purports to permit its users the ability to "Access Remote Live Streaming Video From Anywhere."

25.     Xanboo claimed to be a pioneer in providing so-called "cloud-based" methods by which home and business owners could monitor their premises remotely.

26.     Xanboo began offering its products as a direct retailer, selling directly to consumers.

27.     Xanboo then began trying to sell its wares to large providers such as AT&T, and other cable companies, telephone companies and utilities.

28.     Xanboo finally hit upon the notion of offering its goods and services to security system dealers and installers who would, or so the marketing pitch ran, be able to superimpose the Xanboo platform with existing security systems, providing remote access and other claimed benefits.

### Xanboo's Inducement of Plaintiffs to form Dealer Network

29.     On or about May 21, 2010, ViSonic sent Xanboo an e-mail inquiry about becoming a Xanboo dealer.  ViSonic had heard about Xanboo through Group Gerhardt LLC ("Gerhardt"), an industry consulting firm.  ViSonic participated in a Dealer Feasibility Study ("DFS") organized by Gerhardt.

30.     On or about May 24, 2010, May 26, 2010, July 8, 2010, and July 14, 2010, ViSonic received from Terry Gurley an email document describing a "Xanboo Dealership Special Offer" attaching a "Xanboo Dealer Starter Order" and "Dealer Premium Program Sample."   Among other things, Terry Gurley's emails all stated: "You will become a Xanboo

Dealer if you order your **Enhanced Security Starter Kit WiFi Upgrade** for **$299.00** <u>**within**</u> <u>**two business days…**</u>.Once you place an order, <u>**you will be an authorized Xanboo Dealer**</u> and you will receive an email with credentials that will allow you access to the Xanboo Dealer Portal." (Emphases in original.)

31.     On or about August 13, 2010, ViSonic placed its opening order with Xanboo.

32.     On or about August 13, 2010, ViSonic received from Xanboo a congratulations note, thanking ViSonic for joining the Xanboo Authorized Dealer Program and including ViSonic's Dealer Code.

33.     Xanboo approached other businesses besides ViSonic involved in designing, sourcing and installing home security and other home electronic systems and products, offering them Xanboo dealerships.   The August 2010 Home Technology eMagazine contains an interview with Xanboo's President and Co-Founder William ("Bill") Diamond, stating that Xanboo had signed up over 600 security dealers within the past 18 months.

34.     ViSonic became a "Xanboo Premium Dealer," as reflected in a November 4, 2010 email from Xanboo's Terry Gurley, "Regional Manager, Dealer Relations," to ViSonic's Raymond Lovell.

35.     Xanboo expressly sought to establish the Plaintiffs as Xanboo's dealer network. A November 9, 2010 email to ViSonic from Terry Gurley, Xanboo's "Regional Manager, Dealer Relations" is instructive.   That email begins: "Hello New Xanboo Dealer."   Attaching an "MRM [My Remote Manager] Mobile Guide," that email stated:

> The attached should be made available to ALL of your employees, sales reps, contractors, technicians and administrative personnel.  Everyone should know that you offer Xanboo Interactive Services and be able to demonstrate at least the basic functions of the Virtual Keypad and Streaming Video.

You should enhance your own demo site so that you can use it to demonstrate the product but you are also welcome to use the Xanboo Demo Site using the following credentials…..

36.     A November 3, 2010 email from Xanboo's controller, Fran Salubro, to ViSonic's Lovell further confirms Xanboo called, and treated Lovell as, a "dealer."  That email encloses a "Customer Receipt/Purchase Confirmation" for $1,289.00 for a "Xanboo Dealer Store Order." This Order included: an "In/Outdoor Nightvision Vari-Focal CCTV 3508 Camera" for $91; "In/Outdoor Vandal Proof Nightvision Vari-Focal CCTV 1060H Camera" for $412; "Camera Accessory – Analog to IP CCTV Converter" for $560; "Controller-System Controller" for $160; and a "Device-Wireless DSC Integration Module" for $48.

37.     Xanboo assigned "Dealer Codes" to the Plaintiffs for purposes of processing sales to the Plaintiffs.  ViSonic, for example, was assigned Dealer Code TMC-1116, according to a November 18, 2010 email to ViSonic's Raymond Lovell from Terry Gurley, Xanboo's Regional Director for Dealer Development.

38.     Xanboo charged its dealers monthly hosting dues of $4.75 per location ($9.50 for ViSonic's two locations) as reflected in an email from ViSonic's Raymond Lovell's Administrative Assistant, Mary Lou Milone, to Xanboo's Terry Gurley dated November 18, 2010.

39.     Xanboo offered "Special Webinar Attendee Pricing" of  $354.42 for "1 Xanboo Controller, 1 Panel Interface Module, 1 WiFi Pan & Tilt IP Camera, 1 WiFi Dongle and 2 Free Months of Service," telling prospective dealers: "Order now and become an authorized dealer today!!!!"

40.     Xanboo also offered a "Premier Dealer Program" for $199, including, among other features, a "Branded Login Page" and "Dealer Locator."

41.     Xanboo recruited dealers to become "Authorized Dealers" and, once these dealers signed up, allowed them access to an "Authorized Dealer Portal."

42.     Xanboo touted its products as "best in class" and "best in breed" claiming the ability to offer advanced, highly flexible networked/cloud based links for alarm sensors and video cameras, notification/display to selected mobile devices or PC's.

43.     Plaintiffs, as Xanboo dealers, would buy these Xanboo products and then install them in Plaintiffs' customers' houses so those customers could remotely monitor their houses' security, HVAC and other systems.

44.     Xanboo's products included, for example, a "Wireless Water Sensor" and a "Wireless Universal Model," both of which ViSonic purchased from Xanboo in Order PO2409 on or about November 22, 2010.

45.     Xanboo also offered Cameras that Dealers could install in their clients' houses. For example, ViSonic purchased an XCH3508 Camera from Xanboo that ViSonic returned because of unsatisfactory "resolution" as set forth in a November 19, 2010 email from Terry Gurley, Xanboo's "Regional Director for Dealer Development."

46.     Xanboo claimed a distinguishing competitive advantage, differentiating Xanboo from other home-control platform vendors: a "cloud based home automation architecture" as described by Julie Jacobson of ElectronicHouse in a December 6, 2010 article:

> Xanboo was a pioneer of the lightweight Internet Gateway for home control, eventually utilizing the Java-centric Open Services Gateway Initiative (OSGi) platform.
>
> Other providers generally required PCs or relatively pricey controllers to deliver the type of rich, interactive communications that Xanboo offered.
>
> Xanboo, on the other hand, sold very inexpensive gateways to the consumer, offloading the heavy processing to the company's own servers.

### Xanboo's Relationship with AT&T Teleholdings and AT&T

47.     Along with its supposedly superior and varied home, commercial, security and HVAC monitoring offerings, Xanboo promised dealers a solid, stable, economically sound business partner, pledging that AT&T's financial backing stood behind Xanboo and its business proposition.

48.     Xanboo also induced dealers to sign up by noting that not just AT&T Teleholdings, but industry heavyweight Motorola, and another company, Lantronix, were Xanboo investors.

49.     Xanboo also enticed Plaintiffs to become dealers by emphasizing that AT&T Teleholdings was not just a Xanboo investor but also a Xanboo customer.  Further enhancing Xanboo's image as having technologically superior products, in 2006, AT&T Teleholdings issued a press release stating that AT&T Teleholdings had adopted Xanboo technology for a "new generation of converged, IP-based services."  This press release also said:

> Ultimately, AT&T will use this unified network to enable virtually seamless connectivity anywhere, anytime, on almost any device, giving consumers what they want, when they want it, wherever they are.  Increasingly, services will be accessible from any of the 'three screens' that many consumers value most: the TV, PC and cell phone.

50.     AT&T Teleholdings began offering Xanboo service to Cingular customers for $199 per month, further supporting Plaintiffs' reasonable belief that signing up to be a Xanboo dealer was a wise choice.

### Group Gerhardt's Involvement

51.     Gerhardt held itself out to the Plaintiffs as a business consulting outfit.

52.     Gerhardt claimed to have analyzed the collapsed market for new housing and its resultant reduction of installation and service opportunities for home security and home

electronics dealers such as Plaintiffs.  A September 15, 2010 email from Gerhardt to ViSonic attached information about "Training in Atlanta" concerning Lutron Electronics, describes Gerhardt's work and role:

> In recognition of the realities of the construction markets, the evolution of technology, and the entry into the existing home systems market by the cable companies, phone companies and AST; Group Gerhardt shows you how to create and sell your own version while you develop your niche and increase your Recurring Monthly Revenue (RMR) in a profitable and controlled fashion that pays for itself immediately, and builds increasing value year after year.

> This niche targets **only existing homes with no construction or remodeling burdens** and offers connectivity through "Broadband Home Management" providing enhanced security, dimming control, temperature control, energy management, text and e-mail alerts, and remote video viewing.  The remote access and intuitive scheduling provides an exciting foundation for profitable installations and higher RMR.  The profit margins range around 40%, that is because there is no AV involved and no "bidding" or competing with Best Buy, Wal-Mart, and the internet.  Seventeen months ago, Rob Gerhardt and Group Gerhardt began to research these opportunities.  The discoveries of this new potential, and the increased recurring revenue connected to it, prompted Rob to organize a group of 50 pioneer dealers to share in a "Feasibility Study" to determine the best answers for these questions.

> > What to Sell?
> > How to Market?
> > How to Present?
> > How to Sell?
> > How to Recruit, Hire, Train and Retain?

53.     Gerhardt focused substantially on showing the Plaintiffs economic models demonstrating the collapse of the robust new housing market on which Plaintiffs had depended for business.

54.     Gerhardt described the "Target" of its DFS: "To discover the effective ways to mount a direct sales campaign into existing homes via mass marketing efforts for Broadband Home Management Systems."  One of the claimed "Key Benefits" was "[t]he ability to leverage the minor efforts (per dealer) within a large group of cooperating dealers."

55.     Gerhardt charged its "Founding Participants" $500 per month dues for five months, plus "minimum costs" of "approximately $700 per month" for "financial-marketing costs."

56.     Lovell was one of Gerhardt's "50 Pioneer Dealers" on which Gerhardt based its analysis and recommendations for the business remodeling Gerhardt urged on the Plaintiffs.

57.     Gerhardt's "Remodel Your Business" approach to the Plaintiffs centrally involved Xanboo and further induced Plaintiffs to become Xanboo dealers.

58.     Gerhardt urged the Plaintiffs to become Xanboo dealers because the Xanboo products and services offerings fit neatly within the "niche" that Gerhardt claimed to have identified and was touting to Plaintiffs whose installation businesses were suffering in the depressed new housing market.

59.     Gerhardt recommended that the Plaintiffs focus on products, such as Xanboo's offerings, that could be installed quickly into the large base of existing houses using marketing methods such as those ADT had successfully employed.

60.     Gerhardt emphasized that the Xanboo products could generate "recurring monthly revenue" ("RMR") for the Plaintiffs, which was crucially important as a replacement for the new installation fees that had largely dried up with the collapse of the new housing market.

61.     Plaintiffs paid Gerhardt for Gerhardt's consulting and marketing services by check payments.

62.     Gerhardt offered "Sales and Marketing Training" to Plaintiffs in conjunction with the Plaintiffs' role as Xanboo dealers.

63.     Gerhardt provided a number of Webinars to the Plaintiffs.  These included, for example, "Important Marketing Plan Update[s]," such as that described in a November 30, 2010

email from Gerhardt to ViSonic's Lovell.  Webinars also included the "DFS Update – Where we are and where we're going" as described in an October 13, 2010 email from Gerhardt to ViSonic's Lovell.

64.    Yet another Webinar, described in an August 18, 2010 email to Lovell from Gerhardt was for "Secutiy [sic] System Meeting #2."

65.    Gerhardt webinars generally included presentation and analysis by Rob Gerhardt with suggestions, comments and collaboration with meeting participants via a "Go to Meeting" web-based conference.

66.    Phone discussions between Group Gerhardt and William Diamond were related to assure Xanboo dealers about Xanboo's program.

### Plaintiffs are Franchisees and Dealers

67.    Xanboo called the Plaintiffs Xanboo's "dealers," invoiced them as Xanboo's "dealers," and described them as Xanboo's "dealers" in written communications including emails and various offerings describing different levels of dealership, such as "Premium Dealer" status.

68.    Xanboo treated the Plaintiffs as franchisees or dealers, using Plaintiffs as a distribution network for Xanboo's products and services.

69.    Plaintiffs fulfilled the role of dealers for Xanboo.

70.    Gerhardt, whose leader Rob Gerhardt spoke from time to time with Xanboo's William Diamond, also systematically described the Plaintiffs as "dealers,"  "Participating Dealers" or Xanboo's "dealers," in invoices, marketing plans, emails, and other communications. In a December 3, 2010 email, Gerhardt's Ross Redman provided Lovell with "the list of dealers in the Florida area."  This list included: Dana Vannatta of Specialty Electronics; Kent Crook of

Wiremasters; Andrew Corcoran of Vitel Communications; Saul Sebastian Saul of Winslow Design Group; and Alex Luty of iQ Electronic Lifestyle.   However, not all of these became Xanboo Dealers.

### Xanboo's Sale to AT&T Teleholdings

71.     Xanboo led the Plaintiffs to believe that Xanboo would continue its product and service offerings through the Plaintiffs' dealerships for at least long enough to permit Xanboo to "expand the offering" with which it started.

72.     A November 4, 2010 email from Xanboo's Regional Director of Dealer Development executive, Terry Gurley, stated in part: "We plan to support the following devices in the beginning and then expand the offering from there."

73.     A November 4, 2010 email from Terry Gurley to Lovell attached a "Xanboo PPT [Powerpoint]", including slides about Xanboo's security offerings, Xanboo's history, products, patents and markets; "Security Partner Programs" with 20 different partners; "interactive services;" a "How it Works" slide; the "Incredible User Interfaces;" and numerous others.

74.     Xanboo's Powerpoint forecast promised more Xanboo offerings to come.   In a slide captioned "Coming in September/October," Xanboo introduced "Xanboo Central Station Signaling via IP" and also "Announce[d] support for the Kwikset Smartcode Z-Wave Enabled Lock" permitting door locking and unlocking "from anywhere," among other new technological home monitoring tricks.

75.     Xanboo's Powerpoint also included a slide captioned "Xanboo Security Enhanced: Available Marketing Materials."   Those materials were eight separate marketing pieces: "trifold brochure;" "service plan sell sheets;" "camera/device sell sheets;" "door hanger;"

"buckslip/billstuffer;" "Dealer 'ask me' button;" "animated banner ads;" and "Powerpoint slide shows."

76.     Not just promising new products, and offering ways to sell them, the November 4, 2010 Powerpoint included a "Financial Benefits" slide.  That slide showed steadily increasing financial benefits "without adding resources!"

77.     At no time before announcing its sale to AT&T Teleholdings did Xanboo disclose to Plaintiffs that Xanboo was considering a possible sale of any or all of Xanboo.

78.     At no time before announcing its sale to AT&T Teleholdings did Xanboo inform Plaintiffs that Xanboo was considering a potential sale of any Xanboo stock or assets to AT&T Teleholdings.

79.     Never before announcing its sale to AT&T Teleholdings did Xanboo inform Plaintiffs that Xanboo was negotiating the sale of any Xanboo stock or assets to AT&T Teleholdings.

80.     A December 7, 2010 email to the Plaintiffs in the Fort Lauderdale DFS from Gerhardt's Ross Redman sent the following, showing the message's author as Gerhardt's Rob Gerhardt:

> During a visit to Xanboo last month, Bill Diamond (the president) told me that AT&T had bought his company after having invested in it in 2006.  He was excited and assured me that, from the small dealer perspective, it would only get better.  He said that the platform was unlikely to be offered to any large companies that could be considered potential competition to AT&T as it enters the broadband home management business next year.
>
> He did say that the development of the Home Dashboard for Energy Management was being postponed again because they did not consider it "the tip of the spear" they way they felt security was.  This would be good news for Power House Dynamics [a broadband competitor's energy monitoring product].
>
> It should also be seen for the validation of security as the entry point into the industry.  This time two years ago Xanboo was a direct to consumer product with

little success or penetration.  Since January of 2009, when they switched from consumer to security dealer based distribution, they have sold over 50,000 systems through a growing network of 700 dealers.  For those of you [who] are postponing the steps to get into the security industry, there is a message you should learn from.

81.    Without any advance notice to Plaintiffs, AT&T Teleholdings acquired Xanboo on or about December 3, 2010.

82.    At the time of the sale, Xanboo's product offering had improved dramatically.  As Julie Jacobson wrote:

The new Xanboo is much different today.  While it had one of the  weaker  home control interfaces in the early days, today's UI is elegant and the platform is much more flexible – right on par with its competitors at iControl, uControl and 4Home.

83.    After AT&T Teleholdings purchased Xanboo, Rob Gerhardt, a Gerhardt principal, assured members of the Gerhardt DFS, including ViSonic, in a "Go to Meeting" web conference, that Xanboo's William Diamond had assured Rob Gerhardt that the Xanboo platform would continue to improve and expand its offerings.

84.    Four months after AT&T Teleholdings acquired Xanboo, on March 31, 2011, an AT&T "general attorney," Meredith Mays, wrote a letter, delivered by certified mail, to the Plaintiffs.  These identical letters, the first correspondence the Plaintiffs had from Xanboo's new owner, stated:

On December 3, 2010, AT&T Teleholdings, Inc. ("AT&T") became the owner of Xanboo, Inc. ("Xanboo"), and AT&T is currently in the process of integrating Xanboo into AT&T's portfolio of services and affiliated companies.  At this time, AT&T anticipates modifying or eliminating current Xanboo products and services and winding down its existing processes.  The purpose of this letter is to notify you that your Agreement shall be terminated effective as of midnight, July 5, 2011.

If there may be some mutually beneficial business arrangement for our companies in the future, we will contact you.  However, because we cannot predict how or what that arrangement, if any, might look like, this  letter  serves  as  notice  that you should not market or sell Xanboo service after July 5, 2011.  Accordingly we

encourage you to transition your service needs from Xanboo to another provider as soon as practicable.

If you have any questions about your existing Xanboo service, you may contact Terry Gurley at…..

85.    Plaintiffs were, as Andy Johnson of Johnson Systems of Falmouth, Mass, stated, "totally taken aback" by the announcement.

86.    ViSonic and Secure2Ware had never even received any "Agreement" to which the Mays letter referred and purported without warning to terminate.

87.    Plaintiffs were aware of no warnings or communications from Xanboo that the work they were doing to promote, sell, and install Xanboo products in the days, weeks and months leading up to the dealer termination might be for naught.

88.    As a blog author Peter M. Rogers described it in an April 11, 2011 posting:

When AT&T bought Xanboo, the Xanboo services (mostly video: good, but expensive!) were sold through dealers across the US.  Now AT&T is shutting the dealers off, and going direct to end users.

89.    Mr. Rogers's posting went on to say:

Alarm industry participant George De Marco said he was not surprised by AT&T's decision to abandon its current sales channel strategy for Xanboo.  This strategic shift by AT&T's management reflects their goal to deal directly with the consumers and by-pass the existing go-to-market strategy for Xanboo.  I believe AT&T will be re-vamping and re-branding the product line to deliver the Xanboo service model under an AT&T bundled service offering"….

90.    Michael Houser, a dealer and principal of Electronic Eye Security, Inc., of Seal Beach, California stated: "I have been in this industry for over 20 years and have never seen something so bizarre as what AT&T did with Xanboo."

91.    The letter from Meredith Mays, AT&T's in-house counsel, telling Xanboo dealers that their contracts are cancelled shows that AT&T is directly and substantially involved in Xanboo business dealings with its dealers.

{KB240148.1  009009-10229}

92.     That letter from AT&T's in-house counsel itself demonstrates that AT&T has control over Xanboo relationship with its dealers.

93.     The Xanboo - AT&T Teleholdings deal is a "merger or consolidation" sufficient to trigger successor liability, in that:[1]

(a)     AT&T Teleholdings did not just buy assets, but all assets and liabilities, including our claims, inherent in ownership of the Xanboo stock;

(b)     Nowhere did AT&T Teleholdings disclaim any such liability - AT&T Teleholdings at a minimum "impliedly assumed" all tort liabilities of Xanboo; and

(c)     AT&T Teleholdings's silence on the deal with Xanboo - remarked upon in the press at the time - precludes any conclusion that Plaintiffs have not pled the Xanboo-AT&T Teleholdings deal with sufficient specificity.

## DEFENDANTS' VIOLATION OF FEDERAL FRANCHISE RULE

94.     Under the Federal Trade Commission Rule governing franchises, a franchise is a "continuing commercial relationship" between two or more parties.

95.     Defendants' relationship with Plaintiffs, in which Plaintiffs, as Defendants' expressly identified "dealers," would represent, market, install and service Defendants' products and services, was a "commercial relationship."

96.     Defendants represented by word and deed that their commercial relationship with Plaintiffs would be "continuing."

97.     Under the FTC Rule, which protects "dealers" as "franchisees," Plaintiffs were Defendants' franchisees.

98.     Defendants, as franchisors, were obligated under the FTC's "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures"

---

[1] Other bases for successor liability may exist, but discovery is necessary to state them with requisite specificity.

{KB240148.1  009009-10229}

(the "FTC Rule"), to make a number of specific disclosures (the "Required Disclosures") to the Plaintiffs.

99.     The FTC rule permitted the Defendants to make the Required Disclosures in one of two forms.  One is the FTC Disclosure Document.  The other is the more recently constituted "Uniform Franchise Offering Circular" ("UFOC").

100.    Franchisors, such as Defendants, must elect to use either the FTC Disclosure Document or the UFOC in making disclosures to their franchisees, such as Plaintiffs.

101.    Compliance with the FTC Disclosure Document satisfies FTC Disclosure Requirements, but does not fulfill the applicable franchise disclosure requirements of most states.

102.    Compliance with the UFOC does, with minor changes, fulfill the applicable franchise disclosure requirements of most states.

103.    Compliance with the FTC Rule Disclosure Requirements alone does not satisfy the franchise disclosure requirements of most states.

104.    The FTC Disclosure Document requests information about the franchisor, information about the franchisee, details of the franchise agreement and facts supporting any earnings claims the franchisor makes.

105.    Specifically the FTC Disclosure document requires disclosure of the following information about the franchisor:

       (a)      Franchisor's business history;

       (b)      Employment history of the franchisor's executives and officers;

       (c)      Litigation history of franchisor's executives and officers;

       (d)      Franchisor bankruptcy history;

       (e)      Bankruptcy history of key individuals of franchisor; and

       (f)     Franchisor's financial statements.

106.    The FTC Disclosure Document must also contain the following specific information about the franchised business:

       (a)     Detailed business description;

       (b)     Franchisee's initial investment;

       (c)     Purchase requirements of franchisee, including use of specified suppliers;

       (d)     Details of any finances proved by franchisor;

       (e)     Services franchisor is required to provide franchisee;

       (f)     Franchisee rights to use trademarks, patents, copyrights;

       (g)     Sales restrictions;

       (h)     Details about current and terminated franchisees;

       (i)     Site selection; and

       (j)     Employee and management training.

107.    The FTC Disclosure Document must contain specific written information about the Franchise Agreement.  Defendants did not provide any required written disclosure to Plaintiffs, although Xanboo's Terry Gurley did tell ViSonic in a telephone call that Xanboo did not offer exclusive territories:

       (a)     Required fees;

       (b)     Exclusive territories;

       (c)     Scope of franchisee's personal involvement in the business;

       (d)     Renewal, repurchase and termination rights and responsibilities;

       (e)     Modification procedures;

       (f)     Covenants not to compete;

(g)     Term of the franchise agreement; and

(h)     Effect of franchisee's death.

108.    The FTC Disclosure Document must also contain information supporting "earnings claims."   Defendants made representations and suggestions about the increased earnings Plaintiffs would achieve by becoming Xanboo dealers and selling the Xanboo platform, products and services.

109.    Defendants never provided Plaintiffs with the FTC Disclosure Document, nor with any of the information that FTC Disclosure Document required Defendants to provide Plaintiffs.

110.    The UFOC requires franchisors, such as Defendants, to disclose information in twenty-one (21) categories:

Item 1:     Basic background information of franchisor and franchise offered.

Item 2:     Business experience of franchisor's principals.

Item 3:     Litigation history of franchisor and predecessors.

Item 4:     Bankruptcy history of franchisor and predecessors.

Item 5:     Initial fees required.

Item 6:     Ongoing fees, in tabular form, including all such fees.

Item 7:     Initial investment, in tabular form.

Item 8:     Required purchases franchisee must make, including revenues or other consideration franchisor receives from such purchases.

Item 9:     Franchisee obligations.

Item 10:    Financing offered or provided to franchisee and default liabilities.

Item 11:    Franchisor obligations.

Item 12:    Territorial limitations.

Item 13:    Trademarks, servicemarks, tradenames, logotypes, commercial symbols.

Item 14:   Patents and copyrights.

Item 15:   Operation of franchise, and franchisee's obligations of personal participation in the business.

Item 16:   Restrictions on Franchisee's sales.

Item 17:   Termination, renewal, repurchase, modification and assignment terms and conditions.

Item 18:   Public figures used in promoting the franchise, their compensation, actual interest in and involvement in the business.

Item 19:   Earnings claims or specific disavowal of any franchisor earnings claims.

Item 20:   Data showing total number of franchisees, segmented by location, type of franchise agreement, and owner; names of terminated franchisees, termination dates, reasons for termination.

Item 21:   Franchisors financial statements, conforming to Generally Accepted Accounting Principles and audited by independent public accountant.

111.   Defendants never provided the Plaintiffs with any UFOC, nor with any of the data the mandatory UFOC would have been required to provide.

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract Against Both Defendants)**

112.   Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

113.   Xanboo offered Plaintiffs the opportunity to become Xanboo dealers.

114.   Plaintiffs accepted Xanboo's offer to become Xanboo dealers, forming a contractual relationship with Xanboo.

115.   AT&T Teleholdings is the successor in interest to Xanboo, and stepped into Xanboo's shoes for all purposes legal and factual material to this Complaint. AT&T Teleholdings continued the same line of business in which Xanboo had engaged, and offered the same products and services to the Plaintiffs that Xanboo had.   After AT&T Teleholdings

acquired Xanboo, Xanboo's William Diamond assured Rob Gerhardt that the Xanboo platform would continue to improve and expand its offerings.

116.    Plaintiffs all provided good and valuable consideration to Xanboo and AT&T Teleholdings.   Plaintiffs invested time, money and effort in becoming Xanboo dealers, purchasing, marketing and installing Xanboo products.

117.    Plaintiffs bought Xanboo equipment and supporting equipment, and designed, developed and implemented marketing launches of and for the Xanboo services, requiring research and development investments and the creation and maintenance of two demonstration sites.  Plaintiffs also investigated and purchased, as appropriate, other, compatible equipment to support the launch and Plaintiffs' sales and servicing of Xanboo customers.

118.    ViSonic paid $9.50 per month to Xanboo in subscription fees for two demonstration sites.

119.    Plaintiffs fulfilled all of their contractual obligations to Defendants.

120.    Defendants never informed Plaintiffs that Plaintiffs had defaulted under their contracts with Defendants, or were otherwise in breach of those contracts.

121.    After AT&T Teleholdings acquired Xanboo, ViSonic asked AT&T Teleholdings what plans AT&T Teleholdings had for its Xanboo dealers.   AT&T Teleholdings did not respond.  Plaintiffs continued to pay their monthly subscription fees to Defendants.

122.    Sometime in approximately mid-April 2011, Lovell called Xanboo's Terry Gurley asking whether ViSonic could continue to grow its subscriber base for the Xanboo products.  Mr. Gurley responded with words to the effect that AT&T Teleholdings was discontinuing its Xanboo dealer program.

123.    ViSonic, for example, was unable to complete sales to at least four accounts, and incurred the following losses as a result of Defendant AT&T Teleholdings breaching the dealership agreement with ViSonic:

### Investment Expense & Losses

1.    Hardware purchases:
- Inv 2183        August 13, 2010 (opening order)        $    844.00
- Inv 2360        November 3, 2010        $ 1,289.00
- Inv 2409        November 22, 2010        $      93.00

2.    Set-up of two demo sites:
- Labor 60 hrs at $20.00 per hour        $ 1,200.00

3.    App Demo Costs:
- IPad and I phone purchase receipt 9/10/10        $ 1,328.00
  To demonstrate Xanboo Remote Manager App
  With streaming view of demo sites' cameras

  Phone service costs to have IPhone
  to demo only avail with AT&T
- October 2010-Current 6/12 early term fee        $ 1,510.00

- IPad 3G service for non Wi-Fi demo
- September 10-December 11        $    195.00

4.    Marketing – Home Show & Launch Promotion Costs:
- Home Show Management Corp.        $ 1,025.00
  12/3/2010 – 12/5/2010 Home Show
- Home Show Electric        $    110.00
- Home Show Fixturing/Cabinet        $    700.00
- Budget Box Truck Rental for show        $    126.00
- Booth Set-up & knockdown 30 hours at $20/hr        $    600.00
- Literature and Collateral Material:
  1. Power Point Presentation Production        $    900.00
  2. Business Card Printing specific to        $    214.00
     Marketing Xanboo
  3. Brochures, residential and commercial        $    448.00
     Ordered through Xanboo's 'my marketing
     engine' fulfilled by Globally Boundless

- THE FOLDER ADVANTAGE IN REMAX
  PREFERRED JANUARY, 7 2011 PAID
  TO Generation Marketing        $    399.00

- APPROXIMATOR SOFTWEAR 6/7/10      $ 2,000.00
- DIRECT MAIL (Post Cards)      $   500.00

5.    Xanboo Project Hardware/Expenses purchased from other Vendors

- DSC Alarm Panels, Sensor Control & Communication Components purchased as part of Demo Site & Home Show presentation:

| | | | | |
|---|---|---|---|---|
| 8/16/10 | 798621 | Alarm Panel | $ | 98.00 |
| 8/16/10 | 800050 | Sensors | $ | 46.00 |
| 9/15/10 | 807528 | GSM/GPRS Communicator &Sensors | $ | 257.00 |
| 11/04/10 | 820057 | Cont. PNL & Sensors For office demo site | $ | 331.00 |
| 11/23/10 | 824519 | GSM Module | $ | 292.00 |

DSC Programming Training, 3 techs for 4 hrs = 12hrs at 20/hr      $   240.00

- Camera Hardware from ADI/JP

| | | | | |
|---|---|---|---|---|
| 11/3/10 | W14T9501 | ALTV1224DC2PS | $ | 147.00 |
| 11/16/10 | W41L6001 | Balums, PS, hardware for residential demo site | $ | 226.00 |
| 11/23/10 | W86B4701 | 40' x 50' outdoor pir | $ | 136.00 |
| | | Bullet Camera Star lite | $ | 249.00 |
| JP | | 3 Cameras | $ | 439.00 |

6.    Lost Account Value:      <u>$ 3,400.00</u>

**Total**      <u>**$19,342.00**</u>

NOTE: This figure does not include additional projected losses of $40,800.00.

124.    Not reflected in the totals above, are ViSonic's additional projected losses, based on the industry's applicable recurring revenue model, of $40,800, as well as additional expenses and damages to be proved at trial.

<u>COUNT II</u>
**(Breach of Duty of Good Faith and Fair Dealing Against Both Defendants)**

125.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

126.    The duty of good faith and fair dealing is implicit in every contract, oral or written.

127.    The duty of good faith and fair dealing prohibits one party to a contract from actions or inactions outside of the contract that have the effect of depriving the other party to the contract from the anticipated benefits of the contract.

128.    Plaintiffs had an enforceable contract with the Defendants under the common law and under the Uniform Commercial Code for the purchase by Plaintiffs and sale by Defendants of goods.  Ms. Mays's purported termination letter itself refers to an "Agreement."

129.    Implicit in that enforceable contract is the duty of good faith and fair dealing.

130.    Section 1-304 of the UCC confirms the Defendants' duty of good faith and fair dealing was part and parcel of the Plaintiffs' contract with the Defendants for the purchase and sale of goods.  When Defendants contracted with and sold their products to Plaintiffs, the Defendants undertook that duty of good faith and fair dealing.

131.    Defendant Xanboo, through the individual Defendants, negotiated and consummated the Acquisition with AT&T Teleholdings, knowing that AT&T Teleholdings intended to discontinue the Plaintiffs' dealerships and to integrate Xanboo's products with AT&T Teleholdings products, and sell them as bundled offerings without involving the Plaintiffs.

132.    By negotiating and completing the Acquisition with AT&T Teleholdings, the Defendant Xanboo, through the individual Defendants, deprived the Plaintiffs of the anticipated benefits of their contracts with Xanboo.

## COUNT III
### (Breach of Implied Contract in Fact Against Both Defendants)

133.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

134.    By its actions concerning writings and communications with Plaintiffs, Xanboo formed and undertook a contract implied in fact with Plaintiffs, that Xanboo would continue to supply the Plaintiffs with Xanboo goods, services and support for a commercially reasonable period of time, and no less than the amount of time required for Plaintiffs to recoup their investments in their Xanboo dealerships.

135.    Xanboo breached its implied contract in fact with Plaintiffs by, among other things, terminating their dealerships without warning and without offering Plaintiffs a method by which to recover their investments.

## COUNT IV
### (Promissory Estoppel Against Both Defendants)

136.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

137.    Xanboo made representations directly to Plaintiffs, and through Gerhardt, that Xanboo would supply goods, services and support to Plaintiffs for the foreseeable future in exchange for Plaintiffs becoming Xanboo dealers.

138.    Defendants should reasonably have expected Plaintiffs to act in reliance on Xanboo's promises.  Among other things:

(a)    Xanboo touted its products as "best in class," well suited to the existing home market.

(b)    Xanboo boasted of its "mature product – 6th generation – 13 patents."

(c)    Xanboo claimed it had shipped "over 50,000" home automation products.

(d)    Bolstering its image as a stable and committed business, Xanboo advertised that Xanboo's platform was "offered by ASG Security, Devcon, Ackerman and over 500 other dealers across the Nation."

(e)    Xanboo further arrogated to itself the status of a strong and stable market presence, saying its "product [is] available at ADI, Tri-Ed, PSA, Alarmax, SGI, APS, EAD & others," all of which are security system distributors.

139.    ViSonic was enticed to become and remain a Xanboo dealer, by, among other things, the promise of becoming part of a well-defined dealer distribution network for Xanboo's existing "best in class" products and for the future products Xanboo promised would soon be on offer.

140.    Plaintiffs did in fact rely on Xanboo's promises, evidenced by Plaintiffs' substantial investments of money, energy, and time in becoming Xanboo dealers, and by Plaintiffs' foregoing of other opportunities in order to become Xanboo dealers.

141.    Plaintiffs' reliance on Xanboo's promises, statements and conduct was reasonable in light of Xanboo's claims of its brand strength, market penetration and support.

142.    Injustice to the Plaintiffs can be avoided only if Defendants are compelled to compensate Plaintiffs for Defendants' broken promises and misrepresentations to the Plaintiffs.

<u>COUNT V</u>
**(Violation of Florida Franchise Statute Against Both Defendants)**

143.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

144.     The Florida Franchise Act, § 817.416, *et seq.*, Florida Statutes, provides Plaintiffs with a private right of action against Defendants.

145.     Defendants are a "corporation, association, or other entity doing business in Florida," pursuant to § 817.416(1)(a), making Defendants a "person" subject to the Florida Franchise Act's provisions.

146.     ViSonic, among other Plaintiffs, is incorporated under Florida law, does business in Florida and under the laws of the State of Florida, and did business with the Defendants in the State of Florida.  ViSonic spoke in Florida with Xanboo representative Tom Christ, and with Arin LoPrete, who was in charge of preparing marketing materials for Xanboo dealers.  Upon information and belief, Arin LoPrete was based in New York.

147.     Defendants, among other things, established the Plaintiffs as franchisees and/or distributorships, giving Plaintiffs the right, in exchange for payments of fees and other consideration, to promote and sell Defendants' goods and services as a part of Defendants' distribution network.

148.     Defendants misrepresented to Plaintiffs, among other things, "the prospects or chances of success of a proposed or existing franchise or distributorship."  § 817.416(2)(a)(1), <u>Fla</u>. <u>Stat</u>. (2012).

149.     Defendants never disclosed to Plaintiffs that Defendants might sell their business to any entity, discontinue their business, or sell their business to an entity that would simply use

Defendants' technology while terminating the franchisees and/or distributorships Defendants had induced the Plaintiffs to enter.

150.    Defendants' inducement of the Plaintiffs to buy equipment, invest in training and in the ability to deliver the Defendants' products foreseeably induced the Plaintiffs to believe that the Defendants would continue the business at least long enough for the Plaintiffs to recapture the value of their investments adjusted for the time value of money.

## COUNT VI
### (Violation of Florida Sale of Business Opportunities Act Against Both Defendants)

151.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

152.    Defendants sold products, equipment, supplies and services to Plaintiffs to enable the Plaintiffs to become Xanboo dealers.  To become "Premier Dealers" in Xanboo's "Premier Dealership Program," as ViSonic did, Plaintiffs were required to pay $299 for a "Dealer Starter Kit," plus $40 for a "WiFi Dongle," and another $199, for a total initial payment of $538. ViSonic's actual initial payment exceeded $800, because ViSonic purchased additional Xanboo items.

153.    Defendants represented that Defendants would provide a sales or marketing program enabling Plaintiffs to derive income from the business opportunity Defendants provided to Plaintiffs, within the meaning of the Florida Sale of Business Opportunities Act, § 559.801(1)(a)(4).

154.    Defendants' sale of products, equipment, supplies and services to Plaintiffs is not exempt from the disclosure and other requirements of the Florida Sale of Business Opportunities Act.  Defendants did not, before making its sales to Plaintiffs, file a notice with the Florida Department of Agriculture and Consumer Services (the "Department") stating that Defendants

were in substantial compliance with the FTC Commission Disclosure Rule, and did not pay any fee to the Department, as set forth in Florida Sale of Business Opportunities Act, § 559.802(1)(b).

155.    Defendants did not provide the Plaintiffs the "DISCLOSURES REQUIRED BY FLORIDA LAW" document required by Florida Sale of Business Opportunities Act, § 559.803.

156.    Defendants did not provide the Plaintiffs with the mandatory written contract required by Florida Sale of Business Opportunities Act, § 559.811, nor otherwise made the disclosures to Plaintiffs that statutory provision requires the written contract to contain.

157.    Defendants did not file with the Department the copies of the "DISCLOSURES REQUIRED BY FLORIDA LAW" document, as required by Florida Sale of Business Opportunities Act, § 559.805(1), (2).

158.    Defendants also violated the Florida Sale of Business Opportunities Act, § 559.809 by, among other things:

(a)    misrepresenting the training and management assistance available to the Plaintiffs, including by not disclosing that Defendants would terminate the franchisees without warning after the AT&T Teleholdings purchase (see § 559.809(4));

(b)    misrepresenting, by failure to disclose or otherwise, the termination provision of the Plaintiffs' franchises, including by not providing the required disclosure documents specifying termination rights, and by never disclosing to Plaintiffs that Defendants purportedly reserved the right to terminate the franchises at will for any reason at all (see § 559.809(6));

(c)    ignoring Florida Sale of Business Opportunities Act, § 559.809(11)'s requirement that Defendants provide the Plaintiffs a written contract as required under § 559.811;

(d)    misrepresenting the material fact that Defendants purportedly reserved the right unilaterally to terminate the franchises at will for any reason at all, and creating the misleading impression that Plaintiffs would be able to recover at least their initial investments in the Xanboo franchises and would be able to obtain sufficient products and services from Defendants to satisfy customer orders that Plaintiffs had worked for and obtained; and

(e)    failing to deliver products, equipment, supplies and services as should have been specified in the mandatory written contract that Defendants never provided to Plaintiffs.  For example, ViSonic had invested time, effort and money in developing orders for Xanboo's "Security Advance" product but was unable to complete those sales because the Defendants without warning purported unilaterally to terminate the franchises and refused to deliver the products for which ViSonic had obtained customer orders.

159.    Defendants' actions and omissions in violation of these described provisions of the Florida Sale of Business Opportunities Act, entitle the Plaintiffs to bring this action to recover their damages, and for an award of Plaintiffs' attorneys' fees.  See § 559.813(3).

160.    Plaintiffs' remedies under the Florida Sale of Business Opportunities Act are not exclusive, but are in addition to any other remedies to which Plaintiffs may be entitled at law or in equity.  See § 559.813(7).

## COUNT VII
### (Violation of Florida's Deceptive and Unfair Trade Practices Act Against Both Defendants)

161.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1" through "111" above, with the same force and effect as if set forth fully herein.

{KB240148.1  009009-10229}

162.    Among other purposes, the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 – 501-213, Florida Statutes ("FDUTPA") is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

163.    Plaintiffs are "consumers" under the FDUTPA, which protects, among other entities, "an individual….business; firm; association; joint venture; partnership…corporation; any commercial entity, however denominated; or any other group or combination.  § 501.203(7).

164.    Defendants and Plaintiffs, as to each other and to third parties, are engaged in "trade or commerce" within the definition of FDUTPA § 501.203(8).  That definition "shall include the conduct of any trade or commerce, however denominated…."  Defendants and Plaintiffs, among other things, engaged trade or commerce governed by FDUTPA by engaging in "advertising, soliciting, providing, offering, or distributing, whether by sale…or otherwise, of any good or service…or any other article, commodity, or thing of value."  Among other things, Defendants offered to provide Xanboo's remotely accessed security program, as well as Xanboo's remotely accessed home management programs, in exchange for Plaintiffs' serving as Xanboo dealers and paying for such products that Plaintiffs would then promote and sell to Plaintiffs' own customers.

165.    Defendants' inducement of Plaintiffs to invest time, effort and money to become Xanboo dealers, and to market, promote and sell Xanboo goods and services to Plaintiffs' own customers was an "[u]nfair method of competition, an "unconscionable act[ ] or practice[ ], and "an unfair or deceptive act[ ] or practice[ ] in the conduct of Defendants' trade or business" within the meaning of FDUTPA § 501.204.  Among other things:

(a)    Defendants' failure to fulfill the FTC disclosure requirements through either the FTC Disclosure Statement or UFOC is in specific violation of 16 C.F.R. § 436.1 and violates the FDUTP under § 501.203(3)(a);

(b)    Defendants' failure to comply with the FTC disclosure requirements set forth in 16 C.F.R. § 436.1 is an unfair and deceptive trade practice under Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)), and is therefore also a violation of the FDUTPA under § 501.203(a);

(c)    Defendants' false and misleading statements to Plaintiffs inducing Plaintiffs to believe that Defendants' would continue to provide Xanboo products, goods, services and supports and would not without warning or giving Plaintiffs the chance to recoup their investments in becoming the Defendants' franchisees violates FDUTPA § 501.203(a),(b),(c);

(d)    Defendants' failure to inform Plaintiffs that Defendants purported unilaterally to reserve the right unilaterally to terminate the franchises at any time for any reason violates FDUTPA § 501.203(a),(b),(c);

(e)    Defendants' violation of the Florida Sale of Business Opportunities Act, described above, also violates FDUTPA § 501.203(c); and

(f)    Defendants' violation of the Florida Franchise Statute, as described above, also violates FDUTPA § 501.203(c).

166.    Plaintiffs are authorized under FDUTPA, § 501.211(2) to bring a civil action to recover Plaintiffs' actual damages, plus attorneys' fees and court costs, as provided by § 501.2105(1)-(3).

167.    Plaintiffs' damages were caused, in substantial part, by Defendants' violations of the FDUTPA.  Plaintiffs would either not have invested in becoming Xanboo franchisees, or would have invested less time, energy and money in those franchises,   had Defendants provided the written disclosures that both Florida and federal law require, and informed Plaintiffs that, among other things, Defendants unilaterally purported to reserve the right unilaterally to terminate the franchises at any time for any reason at all.

168.    Plaintiffs also would not have incurred the opportunity costs they incurred in developing customers and orders for Xanboo goods and services, only to find out later, as ViSonic did, that Plaintiffs could not fulfill those orders because Xanboo terminated the franchises and refused to deliver Xanboo products to the Plaintiffs so Plaintiffs could complete their own contracts with customers.

169.    Defendants' purported franchise terminations exposed Plaintiffs to claims by Plaintiffs' own customers for breach of contract and related claims arising from Plaintiffs' inability to obtain Xanboo products and services to provide to Plaintiffs' own customers.

Defendants' purported franchise terminations and refusal to deliver requested Xanboo products and services caused Plaintiffs actual damages, which are partially set forth above.  ViSonic was deprived of the profit it would have made on customers who would have ordered Xanboo products and services.

170.    Plaintiffs' cause of action, and available remedies under the FDUTPA are not exclusive, but, as set forth in § 501.213(1), are in addition to all other remedies to which Plaintiffs might be entitled under state or local law.

## COUNT VIII
### (Class Action Allegations)

171.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs "1"

through "111" above, with the same force and effect as if set forth fully herein.

172.     Pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1, Plaintiffs

seek certification of the following class, subject to completion of class certification discovery

and any necessary or appropriate modification of this class definition and/or sub-classing:

> All entities in the United States that: (i) became Authorized Dealers of Xanboo
> within the four years preceding the October 22, 2012 initial Complaint in this
> action; (ii) whose dealerships were terminated by the March 31, 2011 letter from
> AT&T General Attorney Meredith Mays; and (iii) who suffered any injuries,
> losses or damages, monetary, statutory or otherwise, as a result of the Defendants'
> conduct alleged in the initial Complaint.

173.     The proposed class is properly maintainable under each requirement of Federal

Rule of Civil Procedure 23(a).

174.     Xanboo's website formerly listed no fewer than 100 dealers.

175.     The members of the Class may exceed seven hundred (700).  In any event, the

Class members are so numerous that joinder of all Class members in this case is impractical.

176.     Common questions of law and fact exist for all Class members.  These common

questions include, without limitation:

(a)     Did Defendants breach their contracts with the Class Members?

(b)     Did Defendants negligently misrepresent the Xanboo platform, services,

products or other relationship terms to the Class members?

(c)     Did Defendants fail properly and timely to disclose to the Xanboo Dealers

that AT&T, which Defendants touted as financially backing the Xanboo platform, was interested

in and eventually was negotiating to buy the Xanboo platform?

(d)     Did Class members reasonably rely on the representations Defendants made about the quality, benefits and financial support behind the Xanboo platform?

(e)     Did the Defendants misrepresent the quality, benefits and financial backing for the Xanboo platform?

(f)     Did Defendants negligently misrepresent the extent to, and duration within, which Defendants would continue to provide the Xanboo platform, services and products to the Class members?

(g)     Were Defendants unjustly enriched by knowing receipt and retention of payments from Class Members in circumstances in which the Defendants' retention of that benefit is unjust?

(h)     Did Defendants commit unfair trade practices under the laws of Florida by, among other things, failing to make proper disclosures to Plaintiffs Class Members about the terms, conditions and other constituent elements of the franchise relationship between Defendants and the Class Members?

(i)     Were the Class members injured economically by the Defendants' conduct?

(j)     Did the Defendants have any legitimate basis to interfere with the Class members' existing business relationships with Defendants?

(k)     Did the Defendants fail to comply with federal law requirements governing disclosures to franchisees?

(l)     Did the Defendants fail to fulfill state law requirements governing disclosures to franchisees?

177.   Plaintiffs' claims are typical of the legal theories and factual bases of the claims of other Class members.

178.   All Class members, like the Plaintiffs, were similarly injured by the Defendants' misconduct.

179.   Plaintiffs will fairly and adequately represent and protect the interests of all Class members.

180.   Plaintiffs have no interest that conflicts with, or are otherwise antagonistic to, the interests of other Class members.

181.   The proposed class is properly maintainable under Federal Rule of Civil Procedure 23(b)(3).

182.   The common questions in this case shared by all Class members predominate in number and import over any questions that might affect only individual Class members.

183.   A class action is superior legally and administratively to all other available methods for resolving the Plaintiffs' and Class members' claims.  While financially significant to them, Plaintiffs' and Class members' losses are not sufficiently large to merit individual litigation.   Plaintiffs and Class members cannot afford such individual litigation.   Judicial economy is well served by concentrating all of the Class members' claims in one forum in one proceeding.   No undue management difficulties mitigate against class action treatment of this case.

184.   Each Count of this Amended Complaint is properly maintainable as a class action under Federal Rule of Civil Procedure 23(g), which requires that the Court must consider the suitability of proposed Class Counsel.

185.     Plaintiffs have retained counsel experienced and competent in commercial and class action litigation.

**JURY TRIAL DEMAND**

186.     Plaintiffs hereby demand a jury trial on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court issue its Order as follows:

A.     Certifying this case as a Class Action;

B.     Appointing ViSonic and Secure2Ware as Named Class Representatives;

C.     Appointing Keefe Bartels, LLC, Douglas Paul Solomon Law Offices, and Eichen, Crutchlow, Zaslow & McElroy as Class Counsel for all purposes in this case;

D.     Granting the Plaintiffs contractual, restitutionary, statutory, common law and punitive damages in full recompense for their damages;

E.     Granting the Plaintiffs their reasonable costs and attorneys' fees as appropriate under the relevant authorizing statutes and legal doctrines; and

F.     Awarding the Plaintiffs such other and further relief as the Court deems appropriate in all the circumstances.


KEEFE BARTELS, LLC                         DOUGLAS PAUL SOLOMON LAW OFFICES


/s/Stephen G. Grygiel                      /s/Douglas P. Solomon
Stephen G. Grygiel                         Douglas P. Solomon
sgrygiel@keefebartels.com                  Florida Bar No. 225800
John E. Keefe, Jr.                         DPSolomon@aol.com
New Jersey Bar No. 034081990               200 S.W. 1st Avenue, Suite 1200
jkeefe@keefebartels.com                    Fort Lauderdale, FL 33301
For the Firm                               Telephone:     (954) 525-4100
170 Monmouth St.
Red Bank, NJ 07701
Telephone:     732-224-9400

EICHEN CRUTCHLOW ZASLOW &
McELROY

/s/ Barry R. Eichen
Barry R. Eichen
New Jersey Bar No. 015851986
beichen@njadvocates.com
Thomas Paciorkowski
New Jersey Bar No. 000822008
TPaciorkowski@njadvocates.com
For the Firm
40 Ethel Road
Edison, NJ 08817
Telephone:     (732) 777-0100

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

Electronic Mail this 26th day of September, 2013, upon:

Aaron Scott Finesilver, Esq.
Alan Feldman, Esq.
Lydecker Diaz
1221 Brickell Avenue, 19th Floor
Miami, FL  33131

Attorneys For James Diamond, Robert
Diamond & William Diamond

Audra A. Dial, Esq.
William D. Meyer, Esq.
Kilpatrick, Townsend & Stockton, LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA  30309

Attorneys for AT&T Digital Life, Inc. and
AT&T Teleholdings, Inc.

Scott A. Markowitz, Esq.
DeMahy, Labrador, Drake, Victor & Cabeza
6400 North Andrews Avenue, Suite 500
Fort Lauderdale, FL  33309

Attorneys for AT&T Digital Life, Inc. and
AT&T Teleholdings, Inc.